JUDGE NATHAN

LeClairRyan, a Professional Corporation
Michael T. Conway, Esq.
Nicole A. Sullivan, Esq.
885 Third Avenue, Sixteenth Floor
New York, NY 10022
Telephone: (212) 430-8032
Facsimile: (212) 430-8062

12 CV 7307

Attorneys for Continental Industries Group, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CONTINENTAL INDUSTRIES GROUP, INC.,

    Plaintiff,

v.

EQUATE PETROCHEMICAL COMPANY,

    Defendant.

Case No. _____

**COMPLAINT**

**Jury Trial Demanded**

RECEIVED SEP 28 2012 U.S.D.C. S.D.N.Y. CASHIERS

---

Continental Industries Group, Inc. ("CIG"), by its attorneys, alleges as its complaint against EQUATE Petrochemical Company ("Equate"), as follows:

1. This is an action for damages, *inter alia*, for breach of an indefinite, exclusive distributorship agreement. Since in or about 1995, CIG has been the exclusive distributor for Equate's resins and polymer products ("Products") in the country of Turkey. CIG was to be the exclusive distributor for Equate's Products for as long as Equate sold its products in Turkey.

2. CIG incurred substantial costs in initiating the venture with Equate, including, but not limited to, the costs associated with creating brand and product awareness in Turkey which involved the expenditure by CIG of substantial time, money and effort in having potential customers accept Equate's Products for testing, qualification of those Equate Products by those potential customers, and ultimate acceptance of those Equate Products for purchase from CIG.

1

3.      Specifically, this process, including pre-marketing and marketing efforts, lasted for a minimum of two years. These efforts included, without limitation, bringing sample products, which upon information and belief were sourced from Union Carbide Corporation ("Union Carbide," now Dow Chemical), to CIG customers before the Equate production facility in Kuwait (the "Plant") was even built to ensure customer qualification of these Equate Products in advance; market surveys; customer selection and evaluation; field visits to many customers; preparations and handing of brochures, product data sheets; making customer presentations; and participating in, manning, renting space for and generally paying for all the expenses for several trade shows in Turkey and Germany at which CIG promoted Equate, its name and Products, and entertained Equate's actual and potential customers.

4.      These activities were under way at least two years before the Plant even started production. Similar efforts by CIG and the associated costs continued throughout the 17 year CIG-Equate relationship in the form of constant CIG marketing and promotional efforts such as, without limitation, participating annually in trade shows – opening and manning booths in trade shows at considerable cost both in Turkey (annually) and Germany (every three years); constant entertaining and visits to customers throughout Turkey; having Equate sales representatives accompany CIG personnel on customer visits in Turkey; printing and distribution of brochures and promotional gifts; addressing customer complaints about Equate's Products during the Plant start-up phase and thereafter; and constant training of the staff of CIG and its local distributor to market and promote the various Equate Products.

5.      In or around late 2011, Equate began refusing CIG's orders for the region, damaging CIG's goodwill and reputation. Further, on or about December 16, 2011, without legal justification, Equate terminated its agreement with CIG causing CIG to incur substantial

damages, including without limitation, damage to CIG's reputation and goodwill, and lost profits.

### Jurisdiction and Venue

6. This is a civil action for damages and other equitable relief. The matter in controversy exceeds the sum of $75,000, exclusive of interest, costs, and attorneys' fees.

7. Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(a) and (b), because a substantial part of the events or omissions giving rise to CIG's claims occurred in this district.

### The Parties

8. CIG is a New York corporation with its principal place of business in New York, New York.

9. Equate is, on information and belief, a Kuwaiti corporation or partnership with its principal place of business in Kuwait. It sells its products worldwide, including into the U.S. Equate is, on information and belief, owned 42.5% by Dow Chemical ("Dow"). On information and belief, several Dow employees have been seconded to Equate to run Equate's operations.

### Background

10. In or about 1995, CIG entered into a valid and enforceable agreement with Equate for purposes of CIG becoming the exclusive distributor and wholesaler for Equate Products in CIG's "market" – Turkey (the "Agreement"). The Agreement was to last for as long as Equate sold its Products in Turkey.

11. The initial negotiations regarding the Agreement were handled by employees of Union Carbide, which was acquired by and became a wholly-owned subsidiary of Dow, in New York and Connecticut. Union Carbide evaluated, tested and put through a rigorous elimination

process (which included several field visits to Turkey and Kuwait) a number of potential exclusive distributor/wholesalers for Equate Products and ultimately chose CIG for this role. Upon information and belief, it was important to Equate that CIG was a U.S. company with U.S. bank letters of credit and U.S. financing, marketing ability and credibility because at that time a U.S. company as its distributor was important to Equate and Union Carbide.

12. The final terms of the Agreement were reached during discussions centered in New York.

13. As a condition of the Agreement, Equate required CIG not to market or sell in Turkey any products of any Equate competitor that were the same as or similar to the Equate Products; and to provide Equate with, among other things: (a) lists of actual and prospective customers developed by CIG in Turkey; (b) the projected Product mix for each CIG customer; (c) CIG pricing; (d) information concerning ports/points of entry and distribution with suggested volume for each, such as detailed cost calculations for shipping including, without limitation, container discharge costs, miscellaneous port charges, duty calculations, port to warehouse delivery charges, delivery charges to customers' locations, port as well as local warehouse storage charges, finance charges, currency conversion costs and charges, and insurance costs; (e) margin calculations; (f) terms of payments for CIG customers with comparisons to the market as a whole; (g) required volumes for pre-marketing and testing of Equate Products by each customer (with explanations as to how these volumes were calculated); (h) information relating to CIG customer order processing and documentation; (i) information concerning the business structure in the Turkey market generally; (j) the duty exemption protocol between Kuwait and Turkey; (k) proof of registration of CIG in Turkey with the local Chamber of Commerce; (l) the

names of CIG's bankers; and (m) the names of CIG's auditors and prior years' financial statements.

14.  CIG invested six months in creating an initial marketing report for Equate (which contained market surveys based on CIG's contacts). Preparation of this report involved multiple trips throughout Turkey to both customers and competitors, specific product volume estimates through the year 2000, recommendations of grades (e.g., types and grades of products that would be most beneficial for Equate to produce and market in Turkey), all for use by Equate in building the Plant and in preparing their internal product and volume estimates, and CIG worked for approximately an additional 18 months before the Plant was built doing pre-marketing and delivering sample products manufactured in the United States, upon information and belief by Union Carbide, but delivered under an Equate label to CIG customers for testing.

15.  Since this was Equate's first foray into the Turkey market, CIG also spent substantial revenue to promote or otherwise market the Equate brand to local customers by spending substantial time, money and effort to have potential customers accept Equate's Products for testing, qualification of those Equate Products by those potential customers, and ultimate acceptance of those Equate Products for purchase from CIG. Once this Product qualification and acceptance occurs, it is difficult and costly to persuade a customer to sample, test and qualify any similar or other product sourced from another supplier. These efforts continued, to a lesser extent, throughout the term of the relationship and were often repeated given the turnover of personnel at Equate and Product problems. Specifically, CIG employees assisted customers in testing Equate Products and spent between 18 and 24 months in the initial Plant start-up phase working to resolve problems with these Products as reported by CIG's customers and repairing the loss of goodwill associated with these problems. Examples of these

"problems" included damaged bags, wrong bag sizes, misprinted bags, mislabeling of the Product grades, actual quality problems with the Products that deviated from the customers' specifications, and delayed shipments. CIG met with the customers several times for each occurrence, resolved them on the ground, got the Product in question either to work or get switched with other grades or Products and provided rebates supported and agreed to by Union Carbide. These or similar commercial and technical problems continued even after this initial period and were not uncommon for the first several years of operations.

16. CIG made substantial investments for infrastructure, staff training in New York, Turkey and Kuwait, meetings, advertising and media coverage, in addition to its significant investment in marketing, selling and purchasing Equate's Products and shifting its own internal strategies and resources to comply with the changing requirements of Equate and Union Carbide. CIG spent upwards of $200,000 in start-up costs associated with its initial efforts for Equate in Turkey, and was precluded from taking advantage of other opportunities to sell similar or the same products in Turkey for 17 years, effectively destroying the ability of CIG to compete in this market.

17. From late 2011, without any justification, Equate refused to fill CIG's orders for the region or did not provide enough goods to satisfy orders, causing CIG to incur monetary damages, as well as damage to CIG's goodwill and reputation, and lost profits.

18. On or about December 16, 2011, without justification, Equate notified CIG that it was essentially terminating CIG's distribution of Equate Products (the "Termination Notice").

19. Upon information and belief, Equate terminated the Agreement with CIG because Equate had improperly agreed to distribute its Products in Turkey through and due to the influence of a CIG competitor in contravention of the parties' Agreement and Equate now sells

directly to several of CIG's Turkish customers, as well as through another distributor to which Equate has provided CIG's confidential information; either way, CIG's profit margins have been diverted to Equate or to this other distributor. CIG, on the other hand, is left without a supply base of similar products due to Equate's and Union Carbide's stringent prohibitions against CIG marketing and selling to CIG's customers in Turkey similar products from a competing supplier for over 17 years.

20. As a direct and proximate result of Equate's actions and/or omissions, CIG has suffered substantial damages.

21. All conditions precedent have been satisfied and CIG has fully performed its obligations under the Agreement.

### As and for a First Cause of Action
### (Breach of Contract)

22. CIG repeats, reiterates and realleges each and every allegation set forth above with the same force and effect as if herein set forth in full.

23. CIG entered into a valid, enforceable agreement with Equate whereby CIG was granted the exclusive right to distribute Equate's Products in Turkey for as long as Equate sold its Products in Turkey.

24. Equate had a contractual obligation to honor the exclusive distribution Agreement between the parties. Despite CIG's demand, Equate has failed to do so.

25. Equate had an obligation to timely fill CIG's orders. Equate breached that obligation starting in late 2011 by refusing, without justification, to fill CIG's orders for the region.

26. Further, Equate's improper acts of: (a) terminating the Agreement without justification; and (b) agreeing to distribute its Products in Turkey through a CIG competitor or

7

directly to CIG's customers; as well as (c) other acts to be uncovered; constitute breaches by Equate of the Agreement.

27. CIG fully performed all of its obligations under the Agreement.

28. As a result of the foregoing, CIG has been damaged and demands judgment in an amount unknown at this time, but believed to be in excess of $5,000,000.

### As and for a Second Cause of Action
### (Breach of Fiduciary Duty)

29. CIG repeats, reiterates and realleges each and every allegation set forth above with the same force and effect as if herein set forth in full.

30. Equate and CIG were engaged in a relationship of trust throughout the course of their dealings. Equate's dominance over CIG in the way in which it was to operate as Equate's sole distributor in Turkey created this fiduciary relationship, including, without limitation, Equate making it a condition of the Agreement that CIG would not market or sell the products of Equate's competitors that were similar to or the same as Equate's Products.

31. During the course of their relationship, CIG furnished and was required by Equate to furnish Equate with confidential information including, without limitation, information regarding the Turkish market, the identities of CIG's customers and, more importantly, the identities of customer decision makers, their volume and Product specification requirements, their timing of purchases, confidential pricing information, market share, payment terms, import logistics and consumption requirements of CIG's various customers.

32. By terminating the Agreement, without justification, and by reaching an agreement with a third party competitor to distribute Equate's Products in Turkey, by Equate shipping to CIG customers ("Customers") directly, and by and through other acts to be uncovered, Equate has breached its fiduciary duty to CIG.

33. Equate through its acts has converted the goodwill established by CIG with CIG's Customers and towards Equate's Products, and the distribution network established by CIG to maximize the sale of Equate's Products.

34. The aforementioned acts by Equate, as well as other acts to be uncovered, constitute a breach of Equate's fiduciary duty to CIG.

35. As a result of the foregoing, CIG has been damaged and demands judgment in an amount unknown at this time, but believed to be in excess of $5,000,000.

### As and for a Third Cause of Action
### (Tortious Interference With Contractual Relations)

36. CIG repeats, reiterates and realleges each and every allegation set forth above with the same force and effect as if herein set forth in full.

37. Equate knew that the Customers were customers of CIG.

38. Equate was aware that the Customers had agreements with CIG.

39. Equate intentionally induced the Customers, and other customers to be discovered, to breach their respective agreements with CIG.

40. The aforementioned acts by Equate were performed without justification and/or excuse.

41. Accordingly, these acts, as well as other acts to be uncovered, constitute tortious interference with contractual relations.

42. As a result of the foregoing, CIG has been damaged and demands judgment in an amount unknown at this time, but believed to be in excess of $5,000,000.

### As and for a Fourth Cause of Action
### (Unfair Competition)

43.  CIG repeats, reiterates and realleges each and every allegation set forth above with the same force and effect as if herein set forth in full.

44.  Under the Agreement, CIG was forced to disclose its list of Customers to Equate, as well as confidential information relating to these Customers including, without limitation, their contact information (including that of their principals), the Product grades and volumes required by each Customer, their buying habits and payment strengths and habits and other information as described above.

45.  CIG spent substantial time, money and effort to develop this confidential information and, under the Agreement, CIG expended substantial time, money, and effort to build and promote CIG's Customers' goodwill toward Equate's Products.

46.  Once the goodwill was built up with CIG's Customers in Turkey, Equate converted said goodwill and Customer accounts for its own use.

47.  Such acts, as well as other acts to be uncovered, constitute unfair competition.

48.  As a result of the foregoing, CIG has been damaged and demands judgment in an amount unknown at this time, but believed to be in excess of $5,000,000.

### As and for a Fifth Cause of Action
### (Unjust Enrichment/Quantum Meruit)

49.  CIG repeats, reiterates and realleges each and every allegation set forth above with the same force and effect as if herein set forth in full.

50.  Under the Agreement, CIG was forced to disclose its list of Customers to Equate.

51.  Such information was confidential and/or proprietary to CIG.

52. Thereafter, under the Agreement, CIG expended substantial time, money, and effort to build and promote goodwill toward Equate's Products, and to establish a distribution system to distribute and promote Equate's Products, and to have CIG's Customers qualify, test, accept and purchase Equate Products for use in those Customers' businesses.

53. Said goodwill was, in fact, established through and because of CIG's efforts.

54. As a result of the foregoing, Equate has had the benefit of, and has misappropriated to itself, CIG's efforts and services and has not compensated CIG for the same.

55. The true and reasonable value of said services is the sum of at least $5,000,000.

56. As a result of the foregoing, CIG has been damaged and demands judgment in an amount unknown at this time, but believed to be in excess of $5,000,000.

### As and for a Sixth Cause of Action
### (Promissory Estoppel/Detrimental Reliance)

57. CIG repeats, reiterates and realleges each and every allegation set forth above with the same force and effect as if herein set forth in full.

58. During the course of the parties' relationship, Equate made promises and assurances to CIG.

59. Specifically, Equate promised and assured CIG that CIG would be Equate's exclusive distributor in Turkey for as long as Equate distributed its Products in Turkey.

60. CIG detrimentally relied on Equate's promises and assurances. Based on the parties' long-standing relationship of over 17 years, such reliance was reasonable and foreseeable.

61. CIG's detrimental reliance includes, but is not limited to the efforts described above.

62. As a result of the foregoing, CIG has been damaged and demands judgment in an amount unknown at this time, but believed to be in excess of $5,000,000.

WHEREFORE, CIG demands judgment against defendants as follows:

A. An award of compensatory and consequential damages in the amount of not less than $5,000,000, plus prejudgment interest;

B. An award of punitive damages in an amount to be determined;

C. Ordering an accounting of all profits wrongfully derived by Equate by virtue of its breach of the Agreement;

D. Imposing a constructive trust over all profits wrongfully derived by Equate by virtue of its breach of the Agreement;

E. Ordering the disgorgement of all profits wrongfully derived by Equate by virtue of its breach of the Agreement; and

F. Awarding CIG its costs and disbursements of this action including reasonable attorneys' fees if recoverable by law and such other and further relief that the Court deems just and proper.

Dated: New York, New York
       September 27, 2012

LeCLAIRRYAN, a Professional Corporation

By: _____
Michael T. Conway
Nicole A Sullivan
885 Third Avenue, Sixteenth Floor
New York, New York 10022
Telephone: (212) 430-8032
Facsimile: (212) 430-8062

Attorneys for Continental Industries Group, Inc.

## JURY DEMAND

Continental Industries Group, Inc. hereby demands a jury trial as to all issues so triable.

Dated: New York, New York
September 27, 2012

                                        LeCLAIRRYAN, a Professional Corporation

                                        By: /s/ Nicole Sullivan
                                            Michael T. Conway
                                            Nicole A. Sullivan
                                            885 Third Avenue, Sixteenth Floor
                                            New York, New York 10022
                                            Telephone: (212) 430-8032
                                            Facsimile:  (212) 430-8062

Attorneys for Continental Industries Group, Inc.